Call the next case for argument, Madam Clerk. 19-2921 from the District of Minnesota, Alexi Portz et al. v. St. Cloud State University et al. Mr. Marisam, we'll hear from you first. Thank you. May it please the Court, Jason Marisam for St. Cloud State University and Minnesota State. I want to focus on two arguments. The first is that the district court got it wrong when it found that the university has tiers for all Title IX purposes based only on how the compensation structure for athletic coaches was set up in a collective bargaining agreement. And the second is that it was also a reversible error when the district court found that there were violations for the treatment and benefits part of Title IX when the only program-wide evidence in the record was that what they're asking for is the piece of the injunction dealing with tiering and treatment and benefits needs to be reversed. So on this question of tiering, let's take a second to talk about how that fits into Title IX and what the court did. So Title IX, as you know, requires equal participation opportunities for men and women in athletics and equal treatment and benefits for the men and women in their teams. Title IX doesn't require or prohibit what's called tiering. The regs guidance don't even mention tiering at all, and there's really basically very little to no case law on it until this case here at the district court. Tiering is just a practice that some schools choose to use where they group their teams into similar levels of support. It can be a useful tool for schools that have large athletic programs to keep track of where all the money is going and how they're dividing things up. But it's undisputed that whether the school uses tiers or not, Title IX, to find a violation, you've got to look at the program as a whole. You've got to analyze the program as a whole. Now, in this case, the university's athletic director and the university's expert testified that the university does not use tiers. The district court found that it has tiers anyway and then went on to issue a part of the injunction based on that. So how did the district court find tiers? It looked to the collective bargaining agreement that covers the university, covers all universities in the Minnesota state system, and saw that it has categories, three categories of sports that are tied to coaches, workload, and ultimately coaches' compensation. And then said, okay, I'm going to lift these categories from the collective bargaining agreement that's called the inter-faculty organization, represents the faculty and coaches. I'm going to lift it, and then I'm going to just issue, put that into my finding. These are the tiers that the university uses. And then from within those tiers found, it went on to say, analyze treatment and benefits based on those tiers. Now, there is no rule, policy, guidance, or precedent saying that a collective bargaining agreement that exists for compensation purposes, that sets the compensation structure, is dispositive on tiering for Title IX. The district court made it up. And this is bad precedent that has to be reversed. And here's why. A collective bargaining agreement exists to set up structures for compensation and employment terms. It's not an athletic policy. It's not designed with Title IX in mind. So if you're looking at it, looking how it's set up, in some ways it can feel like a trap, that you're just saying, these are your tiers and there's not equity there. The school wasn't trying to show equity and equality through these tiers. Might it be useful, though, higher paid coaches, for example, could be relevant to benefits such that higher paid coaches tend to get better facilities, and we see that in college athletics. So for that reason, could it be at least relevant? So, yes, Your Honor. It is relevant to one factor, and there's this laundry list of factors that you look at for treatment and benefits. One factor includes coaches' compensation. So a collective bargaining agreement could be relevant to coaches' compensation. However, in this case, the district court found no evidence of any disparities between the salaries of the coaches for men's teams and the coaches for women's teams. It's paragraph 50 of the legal conclusion. So the one factor where a collective bargaining agreement could be relevant to, it doesn't apply in this case. And that gets to the larger problem. You have this laundry list of factors. You've got to go through and analyze the factors. You can't just say there's a collective bargaining agreement and it's relevant. Now, your point is, like, maybe it could be, there could be some causal connection, but I don't think it excuses those things to find, is there actually a program-wide violation there? Counsel, this may be another way of asking the same question, but even assuming that the district court erroneously found these tiers and engaged in this tiering conclusion, how did that impact the analysis of the compliance of the program as a whole? Yes. So there are two parts to what the district court did that was wrong and created a problem. And I'll back up and say there's one part of the district court that we're not contesting, and that is participation opportunities program-wide. The district court found 51 percent of the student body was women, 48 percent of the participation opportunities were for women. We're not contesting that. The university has fixed that. We're worried about the second part, which is all about tiering and treatment and benefits. And so the district court did two steps, both of which were problematic. The first is to find tiers based on this collective bargaining agreement. And, again, which is setting worrisome precedent here, particularly for all the universities bound by that collective bargaining agreement in the Minnesota state system. They're saying, well, wait a minute, are we locked into that? What was the athletic director talking about in her deposition when she was referring to tiers? Yes, Your Honor, she was referring to the categories that exist in the collective bargaining agreement. As an academic institution governed by a collective bargaining agreement, there's a lot of attention paid to the union and union issues. So they are very sensitive to the collective bargaining agreement. And so she was referring to that. And the testimony at trial is completely consistent with that. So the first piece, then, to go back to Judge Grazza's question, is finding tiers based on the collective bargaining agreement. The second piece is to then not do an analysis of the program as a whole. If you read the court's opinion, the court is cherry picking individual sports and saying, okay, baseball. Baseball has a nice field. Softball doesn't. That's a violation. That's not how Title IX works. You have to look at the program as a whole. And a key, key fact showing how the district court got it wrong, women's volleyball is a sport at the university that gets a lot of resources, a lot. And it's not mentioned at all, at all in the district court's order. So how can the district court find a problem saying, oh, there is unequal treatment and benefits when you're not even putting women's volleyball into the equation to assess it? Didn't the district court go one step further? My understanding is the district court said not only what you just said, but went and said, among the tiers, inside the tiers, there needs to be equity. And so I don't know what the support for that necessarily is, but, you know, maybe you can enlighten me. But that seems to me to be problematic because I don't find that in Title IX. That's exactly right, Judge Strauss. So tiering is a useful tool that schools can use, but it's not built into the Title IX at all in the regs, the guidance. The test is always looking at the program as a whole. And when you're starting to say there has to be equity within the tiers, there's another, there's a reason, there's a practical reason why this doesn't make sense. And that is there can often be fluidity within tiers. So you could have a team that gets, on one of the laundry list factors, gets a lot of resources, and another gets low resources. So, for example, you could have a team where a lot of money is spent on equipment because it's just the kind of sport that requires expensive equipment. But it's not otherwise a priority for the university, so they don't spend much money on travel. How do you handle that if you just say, oh, it's mixed, high and low, we're going to put it in tier two? It doesn't get to this program-wide analysis. At the end of the day, when you're looking at equipment, you've got to plug in the fact that here's a sport with a lot of money and equipment. When you're looking at travel, plug in the fact that here's a sport where you don't spend a lot on travel. And just plugging it into a tier and saying we're going to do a tier analysis complicates things. So practically it doesn't make any sense. And then legally, to your question, Your Honor, it's not there in Title IX at all. The district court made it up. And I want to emphasize this point. If you do a Westlaw search for cases talking about Title IX and tiering, there are really two things that come up. There's a case from the 90s out of the First Circuit called Cohen v. Brown University that talks about the fact that Brown had two tiers. And that's about it. And then there's this Ports case that comes up where the district court built tiering as a central part of the district court's finding and analysis. This is setting precedents here that is not in Title IX. And it's worrying. It's certainly worrying to my client who has this collective bargaining agreement out there setting these tiers. But I also think there's a larger problem. Title IX applies to public schools, not just universities, but to public schools, public high schools. So any public high school out there with a collective bargaining agreement that sets coaches' compensation is vulnerable to just someone suing and saying, They're tiers. Look at the collective bargaining agreement. And then they might just find a violation because, of course, that collective bargaining agreement isn't set up with Title IX in mind. The school might not even run that. Just as a quick example, I did some Googling before argument. Minneapolis Public Schools has a collective bargaining agreement that sets coaches' compensation. So this precedent isn't just about the university or Minnesota State. And so I want to flag that point. This is really the case out there on tiering now. And there are two problems with it. One, tying it to a collective bargaining agreement that is only relevant really to compensation. And again, there is no findings of any problems with compensation here, so it should have been irrelevant. And two, as you say, Judge Strauss, there's nothing in Title IX about doing a tiering analysis. And I want to point out then now, so that's pretty clear where the law is. The plaintiffs and appellees in this case do not try to defend how the district court did tiering. In fact, they run from it and they say, well, we don't read the court's decision as requiring the university to have the tiers that are in the collective bargaining agreement. They could get rid of tiers altogether or change the tiers. That's their position in their brief. The problem with that position really is it just highlights how badly the district court got it wrong. If the collective bargaining agreement isn't setting the tiers, then why is the district court bargaining agreement didn't make any sense? There's a second reason. It's more practical. I don't think it's good law to say that a collective bargaining agreement is setting tiers for Title IX purposes. That is hamstring the university. If it is setting the tiers, you have to go through the collective bargaining process. I don't see how that is a good outcome. And I think the other side recognizes that, which is why they back off the position and say the university has complete discretion to change the tiers. But again, that just highlights the problem. If we have that discretion, then the court shouldn't have found the tiers based on the collective bargaining agreement to begin with. But how did the finding of the tiers affect the analysis? If the judge still went through and analyzed all these programs and the treatments and benefits? The problem is that from that finding, there didn't flow then a program-wide analysis. So you see the judge. It's quite clear reading the order. The judge is just cherry-picking sports and comparing one to one. And the only, only program-wide evidence… Why can't you do a program-wide analysis by going through individual sports one at a time or individual circumstances one at a time and then making a collective conclusion? Yeah, I think the right way to do it is to look at the factors, the laundry list of factors in the Code of Federal Regulations, and going through the factors and comparing them. And you could do that. And that's what our expert did. There's 60 pages of testimony. It's unrebutted. The only testimony of program-wide treatment benefits is our expert. It's in the appendix starting at 547. Their expert didn't offer any program-wide testimony on treatment and benefits. So that is the way to do it. The problem is really the cherry-picking in a way that might seem intuitive, like, oh, I'm comparing baseball to softball. But that's really not the right way to do Title IX, particularly as I said… I'm hearing rather high-resource sports. So there are two steps in the analysis that are problematic. One is finding the tiers based on the collective bargaining agreement, and then from those faulty tiers, doing this inside the tier analysis without doing a program-wide analysis as Title IX requires. You know, I have to be honest with you. I agree with you that there was tiering, obviously. I agree with you that there was cherry-picking. Volleyball was rarely, if ever, mentioned, despite the fact that it was the chief sport. I'm just not sure, to get back to Judge Graz's original question, maybe Judge Colleton's most recent question, whether they're related. In other words, are those two things related? And I'm just not sure the answer to that is yes. Maybe you can help me connect them a little bit better. I'm okay if they're not related. I'll say I've got an issue with the tiering because I think it's really bad precedent that's really troublesome for my client. The collective bargaining agreement is still out there with those categories, so any of the universities in Minnesota's state system could still be sued on them under the theory in force. That's worrying to me. And then on the facts of this case, I'm bothered by the fact that there wasn't a program-wide analysis. Whether they're tied together or not, they're both reversible error, and I'll reserve my time unless there's a question right now. I do have one quick question, counsel. Could you briefly address the role of the gender equity manual in the district court's analysis, and what weight is that entitled to? Yeah, the general equity manual is authored by leading experts in Title IX. It's not Title IX guidance from OCR. It has weight to the extent that they're looking at the practices in the university. I don't think it's all that relevant at the end of the day because nothing in that manual is talking about not doing a program-wide analysis as required by Title IX. Thank you. I'll reserve it. Thank you for your argument. Ms. Van Dyke, we'll hear from you. May it please the court? My name is Sharon Van Dyke, and I represent the plaintiffs in this matter, the appellees. Moving straight to tiering, because this seems to be the focus of the entire appeal, the appeal is based, frankly, on a false premise. And that false premise is that the district court may alter decisions with respect to violations of Title IX based on only the collective bargaining agreement. Only, that's not true. If you look at paragraph 13, which is where that statement comes from, in the judge's memorandum, there's a citation after the fact that he finds tiering. And there's a citation that refers to the collective bargaining agreement, but there's nothing about that citation that would indicate that that's the sole source of his information for finding tiering. Because if you look at the entire record, tiering was discussed from A to Z. It was discussed particularly with respect to treatment and benefits, which is where it raises its head the most. I want to address... When it was discussed in other places, was it tied to the bargaining agreement, or were people defining tiers based on other criteria? It was not tied to the collective bargaining agreement. Certainly, there was reference to that as being one place that's mentioned, but that was literally one place in the transcript, except for questions that referred back to it. For instance, there's reference to tiering in a gender equity meeting minutes that didn't reference the collective bargaining agreement. There are emails going back and forth from the current athletic director at the time that she was... Right before, mostly, before the announcement of the elimination of the two sports that talked about some of those things. Tiering was discussed by Donna Lupiano, the plaintiff's experts, throughout. It was defined in their case in chief and referenced, frankly, to the gender equity manual. What weight was one of the questions, should the court give to that? It's an NCAA publication. It's not OCR. It's not binding. It's something that the NCAA publishes for schools that are NCAA members, including SCSU. That doesn't include high schools. What did Donna Lupiano say about how she defined the tiers? As I understand it, she had four tiers rather than three, which would suggest she wasn't using the collective bargaining agreement. Correct. She was using the definition. Basically, it's a way to financially maintain equity so that, at the end of the day, you have a program that meets all of the equity requirements, both with respect to prong one, the participation opportunities, equity between men and women, and also with respect to treatment and benefits. A program-wide assessment, for instance, of treatment and benefits would require you to compare all the men, all the women, in one lump, and the treatment and benefits, all of the separate little things in the regulation, locker rooms, practice facilities, everything, and compare them basically line by line and then form an overall discussion about whether or not this one could offset that one. Some can and some can't. What she said is the reality is schools can't afford to do that. They really can't these days as budgets go down. What schools do, and they do it all over the place, especially in Division II schools, is they tier by financial support. That's different than levels of competition, which would be like Division I, Division II. Financial support. It's okay to support some teams more than other teams as long as you have levels like that. That would include coaching. Do they travel? What does their recruiting budget look like? Some are large. Huge difference in those kinds of things. I want to ask you about the tiering, too. More the legal conclusion or the way the district court used it, which is to say he implied, if not outright said, that there needed to be, not equity, but within the tiers, there needed to be some balance between men's and women's sports. But just taking this tiering analysis and assuming that there's three, you could have a situation in which men's sports, half of them are in one, half of them are in three, tier three. And then you could have all the women's sports placed in tier two. And the fact of the matter is that would not violate Title IX, despite what the district court said about the tiers and maintaining balance within the tiers. And I want you to address that because I think that the tiering may have been used for a nefarious purpose that isn't necessarily supported by Title IX. The Title IX requires equity in the treatment and benefits provided to the people in the tiers. If you understand financial support for tiering, high levels, the high levels, tier one, for instance, and it doesn't matter whether it's the four or the three. What matters is, is there an obvious line between how teams are treated? And the idea is that the balance, the equitable balance in terms of numbers of athletes, women and men, in tier one or tier two or tier three. And it doesn't have to be exact, but it has to be proportionality. It has to be proportional. If you do that, you're going to come out okay on the way prong one works. Why does that matter, though? I mean, here's the question I have is why does it matter? You're supposed to look at it as a program as a whole. And so as long as, in this case, women are receiving the same amount of financial support or benefits that men are. It doesn't matter whether they're in tier one, tier two or tier three. You can have you can have them be at different tiers and still satisfy Title IX. That's true. And I think the point is that he did a program wide analysis. He did both. And he did exactly what the gender equity manual says. Schools, if they're going to use tiering, this is what they have to do. They have to balance. There's an assumption made in the gender equity manual. And I think that's maybe the piece that's missing. The piece is that these are financially supported tiers. And if you've got a highly supported tier, tier one, there's a lot of money going into those sports. Be they female or male. And they're getting good coaching. They're getting great facilities. They're getting good locker rooms. They're getting supported travel. They have a good recruiting budget. The whole thing. The guys in the small levels have a quarter of that, if that. And that's true at St. Cloud State. That's fine, because if you look at the whole thing as a whole, because each tier is equitably financed, as a whole, it comes out equitable. Men and women, men and women, men and women, men and women. That is the theory. That's what he did. And he also simply looked at all the different sports. And he did look at volleyball. There are multiple references to it. And right at the beginning, it was stated that it's in tier one. It's in the top tier. So it's getting the high level of benefits. And so there's not a lot of discussion about it, because there was no need to. It's equivalent, program-wide, if you do it correctly. The reason Donald Lopiano was unable to do a total analysis in the end was that they didn't meet prong one. And the judge went ahead and analyzed all of the data anyway. Counsel, on the volleyball, I got to be honest. I read the district court's order a few times. And one of the things I noticed were that things like softball were mentioned multiple times. And I actually had to go back. You're right. The district court did mention volleyball, but not very much. And that, to me, was a pretty big omission, given the fact that it's the premier women's sport, at least at St. Cloud State University. What's your response to that? I mean, I guess the response maybe is that it wasn't necessary. But it seems to me it would be, since there was so much time spent on football and some of the premier men's sports as well. The reason time was spent on football was simply because it's numerically large. 97 players. And even if you're not even looking at a tier, if you've got 97 players in one sport, it's difficult to balance. That's why football was talked about a lot. It wasn't talked about a lot in terms of treatment and benefits because there was no need to. They had great facilities. And that's all you needed to say about it. They had great coaching, great facilities, top tier. Volleyball is the same. It's just a smaller number of people. So there was nothing that was standing out about that. And they're referenced a couple of times in the program-wide section, primarily. Basically because they shared the best facilities, they shared the best locker rooms, they had all the best stuff. There was no need to talk about them a lot. Softball, two reasons. Number one, the treatment and benefits, particularly with the fields, were enormously different between softball and baseball. And second is just a practical reason that we had a live witness on the stand. If you take the argument that was made in the briefing, that you need to have somebody from every program talk about, go through the whole list on every program. We would have been in trial a week and a half later. And that's basically not how trials generally work. And it's not required. So some of the sheer time was a function of having a live witness. And in reality, a large part of it was volleyball is treated very well and it has a much smaller number of players. It's in the teens versus 97. I would point out that with respect to the first prompt in the test for numerical equivalency or balance equity. If you look at Judge Thunheim's methodology, he didn't use tiers at all in arriving at his conclusion that there was inequity there. He used totals. Tiering came up in treatment and benefits. I hear our opposing counsel making that concession. He can correct me certainly on rebuttal if I'm wrong. But I don't think they're challenging the numerical participation opportunities. I think it's mostly the tiering and the treatment and benefits, unless I'm misunderstanding. That's how I read their brief. But I also wanted to make the point that it ends up in treatment and benefits. I wanted to ask you if I could regarding the relief that was afforded at the district court level. There was an injunction entered that mandated the continuation of particular sports. Was that intended to address just the participation opportunities or also the treatment and benefits? It was written with respect to the participation opportunities. But I believe it states in the paragraph that describes keeping those sports and the conditions under which they keep the sports that they are to be maintained in whatever tier they're in. Unless there's evidence that the interest is not there, in which case you drop them and add something else. That brings me to the idea that the injunction somehow locks the university into having tiers forever. It simply doesn't do that. There is nothing in that order that says you have to maintain these tiers or you can't change these tiers. There's nothing in that injunction that says that. Is there authority in Title IX to demand the continuation of particular sports or is the authority just to bring the university into compliance generally? The majority of the authority talks in general terms about coming in compliance with Title IX. If you go to management of injunctions in the case law that is in that particular area, what the authority says is that it's permissible to make an order with respect to a particular sport. But only until such time as compliance gets reached, at which point the court doesn't do that anymore. It's up to the school to maintain that compliance. Does that entail continuing management by the district court? I don't know that the court manages the teams. He's listening to see that everything's maintained until such time as it gets in compliance. In this particular case, the overall order of the court was you need to be making steps to come into compliance with Title IX. And while you're in the process of doing that, you need to keep these two teams. I will admit that that's probably the least strong portion of the injunction, the fact that he singled out these two teams. But he also doesn't make the school keep them. If there's a demonstration on their part that the interest is not there, they can let those teams go and do something else in this place. Do they have any more flexibility than that? Suppose they just come up with a whole different proposal that has fewer teams or something, or for some other reason, they don't want to maintain those teams as part of a plan to comply with Title IX. Could they go back to the court? Yes, they always can. The case law would indicate that they could go back and come up with a plan and say, this is what we'd like to do. And if it is reasonable and rational and they can explain why it's going to get them where they need to go, the case law is really clear. And I think there's nothing in this order that would prohibit it for them. They can go to the court and say, this is what we want to do. And if it's going to put them in compliance with Title IX, that's how it works. The one part of this order that arguably does require tiering is that it says that they have to maintain the tennis and skiing teams at a level of support comparable to other teams within the same tier of support. What do you think about that? I mean, is that really a proper order? Because I thought even within tiers, you could have differing levels of support as long as the overall treatment is equitable. I believe that your description would be accurate. It just had been so far out of compliance that that part of the order does not tell you what tier it's going to be in. I mean, I think they could move them. If they wanted to, they could move something else. But whatever tier that the school decides they want those teams to be in, they have to be within the range. And it's described as a range in the testimony of Don Lupiano, within the range of the tier that the school decides to put them in. He's not telling them what tier to put them in. Was the record that teams within the tiers, as they were defined in the district court, all received roughly comparable support, all the teams within each tier? Yes, it was the exemplary material, and it was the Plaintiff's Illustrative Exhibit 246, that basically shows how the tiers are described. And it's also within Don Lupiano's testimony in that area that describes how it is that you differentiate tiers. And it's looking at the support and the areas of support and then looking at ranges. And it's a range. It's not an exact thing. I had one more question, then I'll stop. But I asked counsel on the other side about the athletic director's deposition on tiering, and he said she was just referring to the collective bargaining agreement. I was thinking of the part where she's asked, are there any other teams, other than the hockey teams, that are resourced at a higher priority level than the other sports? And she says, we have three tiers. Tier one includes hockey, but also football, women's basketball, men's basketball, and volleyball. Tier two includes baseball, softball, and so forth. And tier three is golf, tennis, and skiing. She did not reference the bargaining agreement, and she volunteered that they have tiers of sports. All right, well, I thought that might be your response. I just wondered, there's a disagreement about that, whether she was defining that as independent of the bargaining agreement. Well, having been at the deposition, and us not having talked about that bargaining agreement at that time, I think if you read the language of the deposition, it's pretty clear she was simply answering a question. Yeah, she does end up saying that's defined partly by the IFO contract. From a coaching perspective, that's how they tier it down. But you could read it to be saying something other than just a recitation of the CBA. It didn't precisely match the CBA. I mean, she clearly knew about the CBA. She clearly knew that that was there. And ultimately, we ended up talking about it. But the part, she volunteered that free and clear in an answer to a question. And in fact, her tiering was three, just like the district court judges. And did Lopiano rely on that testimony in formulating her? She did. Yeah. And I'm out of time. Yes, well, if there are no more questions, we thank you for your argument. And we'll hear from Mr. Marisam in rebuttal. Thank you, Your Honor. So first to Judge Strauss, yes, we are conceding the overall program-wide participation opportunity gap. It's not an issue anymore. We have fixed it, largely by the elimination of football, actually. But the rest of the court's injunctive order is rife with reversible error. Briefly, on the tiering, where it came from, they're lifted from the collective bargaining agreement. The best testimony on that is the Appendix 510 and 511. Well, that's the place where it was referred to in context of the CBA. But you're on such strong ground with the athletic director. Well, that was deposition testimony, and I don't want to go down that road. But I will say the court listed sports we don't even offer because he listed them from the collective bargaining agreement. He listed sports because the collective bargaining agreement covers all seven universities. So he's listing sports that St. Cloud State doesn't even offer. How does he do that? He just looked at the collective bargaining agreement and lifted them. Clearly, there's no testimony from the athletic director that we offer that those are tiered sports because we don't offer them. Well, all right. That's a different question from whether there are tiers. He may have made a mistake on mentioning a particular sport. I mean, the main point here is that if the court wants to hold that they're not from the collective bargaining agreement, I'm kind of okay with that to the extent that it's terrible law and precedent if the collective bargaining agreement is dispositive for all of Title IX. But regardless of what the analysis was done by the district court, the injunction itself requires the university to provide equity at every tier of the athletic department. So regardless of Ms. Van Dyke's argument that, oh, he did a program-wide analysis, that is not what we're ordered to do. Which part specifically are you concerned about? 3B. I mean, we have to provide immediate steps for equal athletic-related treatment and benefits at every tier of its athletic department. So we're saying, one, we don't have these tiers. Two, ordering us- Wait a minute. What are you talking about? Say it again now. 3B, we're open at two? Is that what you're worried about? With the beginning that St. Cloud State University must take immediate steps to provide its female athletes with equitable athletic-related treatment and benefits at every tier of its athletic department. Well, if you decide to have no tiers, then you could comply. I mean, our testimony- You have what tier to comply? Our testimony is that we don't have tiers. I guess that means you have a single tier in your view. Everything's on the same tier. We don't need to have any tiers. It's a program-wide analysis, Your Honor. That's the whole problem. The district court made up this idea that we need to have this equity. It's a program-wide analysis. And the only program-wide evidence in the record is our unrebutted expert testimony on treatment and benefits. That is the only program-wide analysis, unrebutted expert testimony. Their expert testified she didn't do program-wide analysis on treatment and benefits. So how did the district court get there to say, yes, you have tiers and you have a right for treatment and benefits? I think there's a lot of reversible error on that point. On the injunction part, if you say the university wants to have no tiers, whether this language really requires you to have tiers, it's by saying that you have to have equity at every tier. If you say we just have one tier, there is no distinction. Everything's on the same level. Then couldn't you comply by providing equitable treatment at that level? Part of the problem. Wouldn't that be equity at every tier? Yes. I just don't think we should create a problem that isn't there in the injunction. So I'm trying to read it to say you have to have tiers. But if you can read it to say you don't need tiers, then couldn't you comply? Right now we're under ongoing district court jurisdiction to report every six months demonstrating that we have equity within these tiers. Now, what the tiers may be, I don't know, but that is part of what we're obligated to do right now. So we're taking those steps. But we are concerned with it isn't enough to say, oh, we could make up our own tiers. This is all continuing jurisdiction. I'll just conclude lastly that you heard Ms. Van Dyke concede that singling out the two teams was the weakest part of the injunction and essentially turning the court into a super, de facto super athletic department director. I'm out of time, and I'll stop there. Well, does the university prefer not to reinstate those teams and to do something different? No, we have reinstated those teams and have upped the amount of resources given to those teams as ordered by the district court. But I think as far as Title IX laws requires, the court should have just ordered a compliance plan on overall participation opportunities, which we have done and do meet. Okay. Thank you, Mr. Marisam. Thank you to both counsel. The case is submitted, and the court will file an opinion in due course. We have concluded.